IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| JUNE SANTO, Ed.D., | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 3:CV-05-2463 |
| | : | (JUDGE VANASKIE) |
| LUZERNE COUNTY COMMUNITY | : | |
| COLLEGE, | : | |
| Defendant | : | |

<u>MEMORANDUM</u>

This is a gender discrimination case arising out of Plaintiff June Santo's, Ed.D.,

employment as a vice president of Defendant Luzerne County Community College ("LCCC"). [1]

Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e-2(a), <u>et</u> <u>seq.</u>, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §

955(a) and (d), for gender discrimination and retaliation.

Presently before the Court is LCCC's Motion for Summary Judgment.  (Dkt. Entry 27.)

For the reasons that follow, LCCC's motion will be granted in part.  Specifically, summary

judgment will be granted on Dr. Santo's claims of disparate treatment in terms of pay, but will

be denied in all other respects.

---

[1]This Court has jurisdiction over the federal law claims presented in this matter pursuant
to 28 U.S.C. §§ 1331 and 1343, and over the state law claims presented in this matter pursuant
to  28 U.S.C. § 1367.

I. BACKGROUND

Dr. Santo started working for LCCC in January of 2001 as the Vice President of Finance and Administration.  (Def.'s Statement of Material Facts ("SMF"), Dkt. Entry 27-4, ¶ 1.)  LCCC employed a classification for administrative positions based on numbered classes, in which Dr. Santo qualified as a twelve.  (Id. at ¶ 2 & 3; Ex. 19, Dkt. Entry 29-2, at 57.)  Her classification was calculated in aggregating points from the following categories:  Education, Experience, Judgment, Supervisory Controls, Responsibility and Confidential Data.  (Classification Guide, Dkt. Entry 29-2, at 72-80.)  Twelve is the highest possible classification an employee is eligible to achieve.  (Id. at 80.)

A. LCCC's Reorganization

In December of 2002, LCCC hired Dr. Patricia Donohue as its new President.  (Def.'s SMF, at ¶ 4.)  At the time of her hiring,  three vice presidents were in place: Dr. June Santo, Vice President of Finance and Administration; Dr. Nancy Kosteleba, Vice President of Academic Affairs; and Thomas Leary, Vice President of Student Development.  (Pl.'s Counter Statement of Facts ("CSMF"), Dkt. Entry 32, ¶ 4.)  As one of her first acts as President, Dr. Donohue formed a leadership team that chose ten vision statements to be implemented into a strategic plan for LCCC.[2]  (Def.'s SMF, at ¶¶ 8 - 10.)  Dr. Santo was part of this leadership

_____

[2]Dr. Donohue had led strategic planning in her prior position at another college.  (Def.'s SMF, at ¶ 7.)

team, which also included the two other vice presidents; Sandra Nicholas, Director of Resource Development; Lisa Nelson, Director of Community Relations; Don Nelson, Director of Technology; and Richard Amico, Associate Dean of Human Resources.  (Supp. Santo Aff., Dkt. Entry 40-2, at 1; Def.'s Reply Br., Dkt. Entry 36, at 3.)

According to Dr. Donohue, the leadership team then formed a strategic plan design team, which consisted of the leadership team and others.  (Donohue Dep., Dkt. Entry 29, at 35.)  Dr. Santo alleges that she was never invited to be a member of the strategic plan design team, but that the male vice president was, as well as Mr. Amico and the Director of Food Services, Peter Moses.  (Santo Aff., at ¶¶ 10-13.)  In addition to forming the planning committee, Dr. Donohue set goals for each administrator, which included Dr. Santo.  (Id. at ¶ 11.)

The following summer, Dr. Donohue evaluated Dr. Santo's performance as Vice President of Finance and Administration.  (Review of Performance, Dkt. Entry 32-4.)  Overall, Dr. Santo received an eight out of ten in her performance evaluation, which indicated she "exceeds standards."  (Id. at 8.)  In the evaluation, Dr. Donohue commented that Dr. Santo was committed to quality and control in fiscal operations.  She had adjusted to the new president and was supportive of announced directions.  (Id.)  Dr. Santo, in the category of "Job Knowledge and Quality of Work," was "timely and effective."  (Id. at 2.)  She was meticulous about finance and legal compliance, and with regard to problem solving and decision making,

3

systematic in analysis of conditions and alignment of priorities.  (Id.)

In other categories, Dr. Donohue gave suggestions for improvement.  In the "Equity, Diversity and Ethics in the Workplace" category, Dr. Donohue noted, "[i]mproving in respectful treatment of others – needs to continue improving in regard to all others, not just those she knows well and supervisors."  (Id. at 6.)  Under "Communication and Interpersonal Skills," there was "[s]ignificant Improvement in working with colleagues," but work was needed "in maximizing potential outcomes of routine relationships."[3]  (Id. at 2.)

In anticipation of the fall 2003 semester, Dr. Donohue presented a major reorganization plan, (Def.'s SMF, at ¶ 13), with an objective of linking LCCC's planning to its financial resources.  (Donohue Dep., at 75.)  The reorganization also envisioned several changes in positions and responsibilities.

Dr. Donohue reassigned Dr. Kosteleba, formerly the Vice President of Academic Affairs in charge of strategic planning, to be executive director responsible for planning and grants development.  (Id. at 25-26, 58.)  This change in position lowered Dr. Kosteleba's grade on the salary scale, but according to Dr. Donohue, LCCC had a policy precluding salary reduction for its employees, so Dr. Kosteleba would have purportedly maintained the same salary.  (Id. at 65-66.)  Dr. Kosteleba ultimately refused the position and left LCCC.  The circumstances surrounding the departure of Dr. Kosteleba are disputed.  Dr. Donohue asserts that Dr.

---

[3]The evaluation form is not signed by Dr. Santo.  (Dkt. Entry 32-4, at 8.)

Kosteleba rejected her new assignment and retired.  (Donohue Dep., at 65.)  Mr. Amico also

contends that Dr. Kosteleba retired.  (Amico Dep., Dkt. Entry 29-2, at 12.)  Dr. Santo disagrees,

asserting that Dr. Kosteleba was asked to leave.  (Santo Dep., at 43.)

  In any event,  Dr. Dustin Swanger was hired to replace Dr. Kosteleba as Provost and

Vice President of Academic Affairs.  (Id. at 43-44; Pl.'s CSMF, Dkt. Entry 32, at ¶ 7; Def.'s

Response to Pl.'s CSMF, Dkt. Entry 37, at ¶ 7.)  Dr. Donohue also promoted the Director of

Resource Development, Sandra Nicholas, to Executive Director of Resource Development.

(Donohue Dep., at 65.)  Mr. Leary maintained his position and responsibilities as Vice President

of Student Development.

  Dr. Donohue further "redesigned the vice president of finance and administration to be

finance and planning, . . . responsible for the department of institutional research and planning

in addition to finance and to be responsible for master planning . . . ." (Donohue Dep., at 76.)

Accordingly, in February 2004, Dr. Donohue changed Dr. Santo's job title from Vice President

of Finance and Administration to Vice President of Finance and Planning.  (Def.'s SMF, at ¶

17.)  The administrative functions of Dr. Santo were assigned to Richard Amico, who was

promoted from Associate Dean of Human Resources to Dean of Administration and Human

Resources.  (Id. at ¶¶ 20 & 27.)  Mr. Amico previously had reported to Dr. Santo, and in his new

position reported directly to Dr. Donohue.  (Santo Dep., Dkt. Entry 29-1, at 18.)

  Dr. Santo did not agree with some of the changes, and told Dr. Donohue that Mr. Amico

should still report to her because he was at a lower level of classification.  (Id. at 18.)  Dr. Santo also complained that Mr. Leary was paid more than her.  (Donohue Dep., at 114.)  Dr. Donohue explained that Mr. Leary's salary was higher because he had been with the school for a much longer period of time than Dr. Santo.  (Id. at 115.)

The reorganization also affected Mr. Moses, Director of Food Services.  (Def.'s SMF, at ¶ 28.)  Dr. Santo had recommended a pilot project, in which Mr. Moses would be promoted to an associate dean for a year.  (Donohue Dep., at 81-82; Def.'s SMF, at ¶ 30.)  Dr. Donohue agreed with the recommendation, and promoted Mr. Moses to the position of Associate Dean of Administration and Auxiliary Services, a vacant position.  (Id.)  Mr. Moses was responsible for running the food service, bookstore, buildings and maintenance, and the conference center. (Donohue Dep., at 91-92.)

During this period, Dr. Donohue requested maintenance and status reports on the condition of a building from Mr. Moses, but apparently did not receive them.  (Id. at 98-99.)  She brought her concerns to Dr. Santo, who supervised Mr. Moses.  (Id.)  Dr. Santo allegedly continually gave Dr. Donohue the same ineffective answers as to why she could not produce the reports.[4]  (Id.)  When Dr. Donohue spoke directly to Mr. Moses, Mr. Moses told Dr.

---

[4]When Mr. Amico became Mr. Moses' supervisor, he reported that it was sometimes hard to get information from Mr. Moses.  (Pl.'s CSMF, at ¶ 15.)  Mr. Amico nonetheless saw improvement from Mr. Moses and recommended making the promotion permanent.  (Donohue Dep., at 105.)

Donohue that he was not at fault.  (Id. at 99.)  After the year passed, upon recommendation from Mr. Amico, Mr. Moses' position as associate dean became permanent.  (Pl.'s CSMF, at ¶ 17.)

Dr. Santo claims she was not properly treated during the reorganization.  She asserts that she was dismissed from financial committee meetings, while Mr. Amico was asked to remain, and that Dr. Donohue sidestepped her and worked directly with Mr. Amico.  (Santo Aff., Dkt. Entry 32-3, at ¶¶ 14-25.)  Dr. Santo further claims she never knew the subject of the financial meetings or the results of the meetings.  (Id.)  Dr. Santo says that, sometime prior to June of 2004, she complained to Dr. Donohue that she was being discriminated against on account of her gender, and told members of the finance committee that she was being compensated lower than the male vice president, as well as Amico and Moses.  (Id. at ¶ 82.)

Mr. Moses stated he never heard Dr. Santo complain about gender discrimination, just that she was under-compensated.  (Moses Dep., at 27.)  Mr. Amico testified that he only heard Dr. Santo complain of receiving a lower salary than the Mr. Leary.  (Amico Dep., at 66.)  Dr. Donohue testified likewise, i.e., that Dr. Santo only complained about her salary.  (Donohue Dep., at 114.)

B.  LCCC's Pay Raise Policy

Pay raises are generally given to the administrators in July of each year, contingent on the budget.  (Def.'s SMF, at ¶ 24, 25.)  LCCC Wage and Salary Administration Policy states

7

that "salary adjustment for a position reclassification will not exceed ten thousand dollars ($10,000) in one year." (Policy and Procedures, Dkt. Entry 29-2, at 69-70.) The following policy exists for classifying positions:

> Positions are evaluated using standard applicable factors which are assigned point values; the total points accredited to a position determines its grade level. Grade levels consist of a minimum, midpoint and maximum salary range. Position grade levels are assigned by the Associate Dean/Human Resources and approved by the College President.

(Policy and Procedures, Dkt. Entry 29-2, at 70.)

With Mr. Moses' promotion to Associate Dean of Administration and Auxiliary Services, his classification changed from eight to ten. (Def.'s SMF, at ¶ 35.) On May 5, 2003, he received a promotion with a salary increase of $8,378.01. (Id. at ¶ 36.) On July 1, 2003, he received an annual increment raise of 5.07%, the same percentage as other administrators, which was $3,108.62. (Id. at ¶ 37; Ex. 19, Dkt. Entry 29-3, at 14.) Dr. Santo alleges this pay raise was in violation of the LCCC policy limit for promotions of $10,000 per year.

Richard Amico likewise received the same annual increment raise of 5.07% on July 1, 2003 for $3,057.87. (Pl's CSMF, at ¶ 24; Ex. 19, Dkt. Entry 29-3, at 13.) On February 17, 2004, Mr. Amico received a promotion and position reclassification adjustment of $6,942.13. (Def.'s SMF, at ¶ 38.) Again, on July 1, 2004, he received an annual increment raise in the amount of $1,800, the same as other administrators. (Def.'s SMF, at ¶ 39; Ex. 19, Dkt. Entry 29-3, at 13.) Dr. Santo believes "that the raises given to Mr. Amico and Mr. Moses were

discriminatory on account of sex in comparison to the increases" she received.  (Santo Aff., at ¶ 83.)

Some time during 2004, LCCC hired a male vice president, Peter Balsamo, as Vice President of Workforce and Community Development.  (Dkt. Entry 29-3, at 13.)  His starting salary was $82,255.36.  (Pl.'s Br. Opp'n Mot. Summ. J., Dkt. Entry 33, at 9.)  Plaintiff alleges she was discriminated against because her starting salary in 2001, three years earlier, was $78,291.39.  (Id.)

Dr. Santo received her standard 5.07% pay increase of $4,129.63 in July of 2003 and $1,800 in July of 2004.  (Ex. 19, Dkt. Entry 29-3, at 16.)  In Dr. Santo's last year of employment, she made an annual salary of $87,381.93.  Peter Moses made $66,222.62 and Richard Amico $74,592.36.  (Annual Salary Chart, Dkt. Entry 29-2, at 56-57.)

Mr. Leary's pay raises followed the same pattern.  He received the standard 5.07% pay increase on July 1, 2003, for $4,494.11, and $1,800 on July 1, 2004, and 2005.  (Ex. 19, Dkt. Entry 29-3, at 14.)  His annual salary in 2004 was $94,935.24.  (Dkt. Entry 29, at 77.)  Dr. Santo alleges that Mr. Amico's compensation increases, compared to her own increases, were much higher, and that she was being compensated at a lower rate than Mr. Leary.  (Pl.'s Br. Opp'n Mot. Summ. J., Dkt. Entry 33, at 3-4.)

C.  Dr. Santo's Performance Evaluation and Performance Update

On June 24, 2004, about five months after Dr. Santo was reassigned, Dr. Donohue

conducted a review of Dr. Santo's performance.  (Def.'s SMF, at ¶ 41.)  In her performance review, Dr. Santo achieved a five out of ten, as compared to the eight out of ten rating she had received a year earlier.  (June 2004 Performance Evaluation, Dkt. Entry 29-2, at 99.)  Dr. Donohue commented, "Dr. Santo's performance is a mix of exceeding standards and unacceptable.  Immediate attention to the comprehensive role of the CFO is required as noted. Her performance dealing with people is unacceptable; immediate improvement is required."  Dr. Santo received a three out of ten in the category "Communication and Interpersonal Skills."  (Id. at 93.)  The comment section of the evaluation mentioned Dr. Santo's clear policies and effective reports and procedures, but noted her needed improvement in demeanor, as she was at times cooperative and courteous, while rude, discourteous and inconsiderate at other times. The evaluation specifically mentioned Dr. Santo being demonstrative and disruptive in meetings.  (Id.)  Dr. Santo's highest mark was an eight out of ten in the category of "Cost management."  (Id. at 96.)

In her deposition, Dr. Donohue attested to other deficiencies in Dr. Santo's work not mentioned in the evaluation.  For a period of time, Dr. Santo failed to give Dr. Donohue written budget projections.  (Donohue Dep., at 132.)  When Dr. Santo finally did so, she failed to give scenarios on how to handle the budget projections.  (Id.)  Dr. Santo disagrees with Dr. Donohue, claiming she provided Dr. Donohue with numerous "what if" scenarios reflecting various combinations of tuition increases, enrollment increases/decreases, and state funding

increases/decreases.  (Santo Aff., at ¶¶ 1-5.)

       In another instance, Dr. Donohue states she put Dr. Santo in charge of coordinating an organizational development project, but Dr. Donohue ultimately completed the project because Dr. Santo did not agree with the project and would not help.  (Donohue Dep., at 139-40.)  Dr. Donohue also claims Dr. Santo was directed to bring all budget requests before the leadership team, but in fact denied several requests without doing so.  (Id. at 153-54.)  Another time, Dr. Santo apparently left off a major project in a capital request to the state.  (Donohue Dep., at 169-170.)  This supposedly left the college in a disadvantaged position for receiving funding from the state.  (Id. at 170.)

       Mr. Amico and Mr. Moses testified of difficulties in working with Dr. Santo as well.  Mr. Amico described Dr. Santo's leadership approach as authoritarian.  (Amico Dep., Dkt. Entry 29-2, at 15.)  In July of 2003, Mr. Amico suffered a heart attack and did not return to work until September.  (Id. at 35.)  Because the doctor cancelled his release date on two different occasions, Mr. Amico did not notify anyone that he was returning to work.  (Id.)  After being at work for one and a half hours, Dr. Santo allegedly called him in her office and yelled and screamed because he had not notified her of his return.  (Id. at 35-36.)  According to Mr. Amico, Dr. Santo then threw him out of her office.  (Id.)  Dr. Santo claims that, even though she called the hospital and wished him well, Mr. Amico sent e-mails to others in the office about his condition, but not to her.  (Santo Aff., at ¶ 62.)

Mr. Moses, in his deposition, described a strained relationship with Dr. Santo.  Between January of 2003 and May of 2003, Mr. Moses worked directly for Dr. Santo.  (Moses Dep., Dkt. Entry 29-2, at 11.)  Mr. Moses described Dr. Santo's behavior as "complete abuse."  (Id. at 17.)  At one point he went to Dr. Donohue to complain about Dr. Santo and how she was treating the staff.  (Id. at 19.)  When Dr. Santo heard that Mr. Moses had contacted Dr. Donohue, she became upset to the point of throwing papers and kicking chairs.  (Id. at 25.)  Mr. Moses listed numerous other individuals who complained of Dr. Santo's behavior.  (Id. at 27-30.)  Mr. Moses, during this period, apparently lost forty pounds due to the stress of working with Dr. Santo.  (Id. at 33-34.)

Dr. Santo tells of a different relationship with Messrs. Amico and Moses.  She asserts that Mr. Moses was verbally abusive on several occasions.  (Santo Aff., at ¶ 70.)  When she reported his abuse to Mr. Amico, the chair of the Discrimination Committee, he laughed and did nothing.  (Id. at 66.)  Mr. Moses was apparently only given probation and a letter put in his file for his abusive behavior.  (Id. at 69 & 71.)

In a document signed by Dr. Santo on August 2, 2004, entitled "Response to Evaluation," Dr. Santo responded to her June 2004 evaluation in order to address the specific categories of her performance evaluation.  (Response to Evaluation ,Dkt. Entry 29-2, at 3.)  She asserted that she was always courteous and responsive at meetings, made well-received presentations, saved the college over $500,000, and achieved 75% of her goals for the year.

(Id. at 3-4.)  She concluded her response in affirming her willingness to pursue the vision of LCCC.  (Id. at 5.)

On August 4, 2004, two days after Dr. Santo responded to her evaluation, Dr. Santo filed a complaint of sex discrimination with the Pennsylvania Human Relations Commission ("PHRC").  (PHRC Complaint, Dkt. Entry 32-5;  Certificate of Service, Dkt. Entry 29-3, at 11.) Dr. Santo, however, did not invoke the LCCC internal Discrimination Complaint Procedure. (Def.'s SMF, at ¶ 23; see Discrimination Complaint Procedure, Dkt. Entry 29-2, at 62; Termination Letter, Dkt. Entry 29-3, at 7.)

In November of 2004, Dr. Santo received a performance update, "to provide feedback on progress related to the performance appraisal for the 2003-2004 year." (Performance Update, Dkt. Entry 29-3, at 1.)  Her performance update noted improvement in certain categories, while requiring immediate attention to others.  (November 2004 Performance update, Dkt. Entry 29-3, at 1.)  In the "Communication and Interpersonal Skills" category, the report indicated that the staff did not feel she respected them based on the tone and manner of her communications.  (Id.)  It noted that, "[w]hile dealing with the President is better, dealing with people requires significant improvement."  (Id.)  The report credited Dr. Santo's effective presentations, but found the lack of personal skills still problematic.  (Id.)  Under "Managerial and Leadership Ability," the report concluded that she "continues to debilitate staff through communication style, micro managing, changing and reversing directions."  (Id. at 2.)  Under

"Job Knowledge and Quality of Work," the performance update mentioned that Dr. Santo

publicly criticized the President, gave incomplete recommendations, and failed to investigate

improvements in technology.  (Id. at 6.)

     D.  The Decision to Discharge Dr. Santo

     In December of 2004, Dr. Donohue and Dr. Santo reviewed the financial structure

report.  (Donohue Dep., at 171.)  Dr. Donohue allegedly found significant errors in the report,

and asked Dr. Santo to revise it.  (Id.)  At a January board meeting, Dr. Santo passed around

the financial structure report, which contained significant errors.  (Id.)  The chairman of the

board asked Dr. Santo if she had proofread her work, and Dr. Santo responded affirmatively.

(Id.)  Dr. Santo apparently had given her approval of the report with the significant errors.  (Dkt.

Entry 29-2, at 10.)

     Later that month, on January 25, 2005, Dr. Santo was suspended with full pay and

benefits so that her alleged continued failure to correct deficiencies could be resolved.  (Memo,

Dkt. Entry 29-3, at 5; Def.'s SMF, at ¶ 44 & 45.)[5]  A hearing was held the following week, on

January 31, 2005, to address the matter.  (Memo, at 5.)  Dr. Santo was notified that her legal

counsel could attend if desired.  (Id.)  Dr. Santo attended the hearing with counsel.  On

February 17, 2005, Dr. Santo's counsel wrote a letter to LCCC, arguing there was no

---

[5] Dr. Santo claims that her assistants, Mr. Nelson and Mr. Gasper, made errors in a financial committee report, and never received any adverse employment actions. (Santo Aff., at ¶¶ 36-43.)

reasonable basis for her suspension.  (Dkt. Entry 29-2, at 14.)  On March 14, 2005, Dr. Santo was terminated from her position at LCCC.  (Termination Letter, Dkt. Entry 29-3, at 7.)

II.  DISCUSSION

    A.  Summary Judgment Standard

    Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

    All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be

entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.  Gender Discrimination Claims

Title VII's core anti-discrimination provision, 42 U.S.C. § 2000e-2(a), makes it unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex;" or "to limit, segregate, or classify" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex."  In order to prevail on a claim of gender discrimination under Title VII, or its analogous provision in the PHRA,[6] Dr. Santo must satisfy the three step burden shifting inquiry under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  See Atkinson v. Lafayette College, 460 F. 3d 447, 454 (3d Cir. 2006).[7]

First, the plaintiff has the burden of proving by the preponderance of the
evidence a prima facie case of discrimination. Second, if the plaintiff

---

[6]Employer liability under the Pennsylvania Human Relations Act follows the standards set out for employer liability under Title VII.  Knabe v. Boury Corp., 114 F.3d 407, 410 n.5 (3d Cir. 1997); see also West v. Phila. Elec. Co., 45 F.3d 744 (3d Cir. 1995); Faust v. Scranton Petro, No. 3:CV-06-0672, 2008 WL 906462, *6 n.8 (M.D. Pa. Mar. 29, 1997).

[7]Because Dr. Santo seeks to prove her claim through circumstantial evidence, the familiar burden shifting framework of McDonnell Douglas is implicated.

succeeds in proving the prima facie case, the burden shifts to the defendant
"to articulate some legitimate, nondiscriminatory reason for the employee's
rejection." Id., at 802, 93 S.Ct., at 1824. Third, should the defendant carry this
burden, the plaintiff must then have an opportunity to prove by a
preponderance of the evidence that the legitimate reasons offered by the
defendant were not its true reasons, but were a pretext for discrimination.

Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981).

1. Disparate Treatment in Pay Claim

In order to establish a prima facie case of unequal pay, a plaintiff must demonstrate that "employees of the opposite sex were paid differently for performing 'equal work'-work of substantially equal skill, effort and responsibility, under similar working conditions." Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000) (citing E.E.O.C. v. Delaware Dept. of Health & Social Services, 865 F.2d 1408, 1413-14 (3d Cir.1989)); see also Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 846-47 (3d Cir.1992) (the standard for a prima facie case under the Equal Pay Act also serves as the standard for a prima facie case in an unequal pay Title VII action). In this case, Dr. Santo has not proffered sufficient evidence to show disparate treatment in pay. LCCC correctly observes that Messrs. Amico and Moses are not appropriate comparators because they both held lower administrative classifications than Dr. Santo, and, even after their raises, their salaries were lower than her's. (Def.'s Br. Opp'n Mot. Summ. J., at 6-7.) Their salary increases above the amount of annual increases were attributed to promotions, a fact that distinguishes them from Plaintiff.  There is no evidence that the promotions and subsequent pay raises given to Messrs. Amico and Moses were based on gender.  In fact, Dr.

17

Santo recommended Mr. Moses for his promotion.

With respect to the disparities in salaries of Mr. Leary and Dr. Santo, Dr. Donohue explained that Mr. Leary had been employed for twenty years at LCCC.  Since all administrators receive an annual increase in pay each year, it is not surprising that his pay was higher than Dr. Santo's, who had only worked a little over four years at LCCC.  Likewise, to explain the fact that Dr. Balsamo's starting salary was higher than Plaintiff's starting salary, LCCC points to the fact that he was hired three years after Dr. Santo.  LCCC notes that there was "inflation and administrative increases given to all administrative employees during that three year period."  (Def.'s Reply Br., Dkt. Entry 36, at 5.)  Dr. Santo has not put forth evidence showing that the reasons given by LCCC are a pretext for discrimination or that gender motivated LCCC in setting the salaries for Dr. Balsamo or Mr. Leary.  Accordingly, summary judgment in favor of LCCC is warranted as to Dr. Santo's unequal pay claim.

2.  Disparate Treatment Claims

In order to make out a prima facie case of disparate treatment, a plaintiff must show that:  (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Samuels v. Postmaster General, 257 F. App'x 585, 586 (3d Cir. 2007) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir.1999)).  "The burden of establishing a prima facie case of disparate

18

treatment [and disparate discharge] is not onerous." Burdine, 450 U.S. at 254.

In the gender discrimination context, whether or not an adverse employment action exists depends upon the facts and circumstances of each case. Jones, 198 F.3d at 411. Employment decisions such as transfers and demotions may suffice to establish adverse employment action. Id. at 411-412. "A job transfer may constitute an adverse job action even where the pay and benefits are identical if there is a reduction in other terms, conditions, or privileges of employment." McGrenaghan v. St. Denis School, 979 F. Supp. 323, 326 (E.D. Pa. 1997).

Dr. Santo has alleged several adverse actions in the terms and conditions of her employment: reassignment of duties, exclusion from the strategic plan design team and finance committee meetings, and Dr. Donohue's cancelling of meetings.[8]  It is undisputed that Dr. Santo's administration duties were assigned to Mr. Amico, a male, who then no longer reported to Dr. Santo, but directly to Dr. Donohue.  Dr. Santo alleges that she objected to the removal of her administration duties, which supposedly diminished the stature of her position.  (Pl.'s CSMF, Dkt. Entry 32, at ¶ 21.)

---

[8]In Defendant's Reply Brief, it objects to several statements made by Dr. Santo in her affidavit.  (Def.'s Reply Br., Dkt. Entry 36, at 2.)  In considering the summary judgment motion, the Court will consider Plaintiff's affidavit only to the extent it sets forth competent evidence. See Robertson v. Allied Signal, Inc., 914 F.2d 360, 365 (3d Cir. 1990) ("To withstand summary judgment, plaintiffs must present [ ] competent evidence . . . ."); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 467 (3d Cir. 1989)(Garth, J., concurring) ("To defeat a motion for summary judgment, competent evidence must be produced . . . .").

LCCC disputes that Dr. Santo was excluded from meetings.  (Def.'s Response to Pl.'s CSMF, Dkt. Entry 37, at ¶ 29.)  Dr. Donohue testified that other positions were also changed or created, such as Director of Resource Development and the Director of Technology, and that the changes did not affect Dr. Santo's salary or status in the hierarchy of the administration. (Donohue Dep., at 65-77.)

It is evident that there is a genuine dispute as to the treatment received by Dr. Santo. Viewing the evidence in the light most favorable to her, a rational fact-finder could conclude that she was being marginalized while males were being favored.  A rational fact-finder could also conclude that the alteration in Plaintiff's responsibilities represented a material adverse change in the conditions of employment.  Thus, because both parties have set forth competent evidence as to whether Dr. Santo received materially adverse treatment in the terms and conditions of her employment, a genuine issue of material fact exists.

Plaintiff has met the fourth element of a prima facie case – whether the alleged adverse action occurred under circumstances giving rise to an inference of discrimination.  Plaintiff has pointed to evidence that her duties were assumed by men, and that male administrators were included in the decision-making process, while she was excluded.  This suffices to satisfy her burden at the summary judgment stage.[9]

_____

[9] Although LCCC articulated non-discriminatory reasons in support of its shift in responsibilities to male administrators, Plaintiff countered by presenting evidence that the reassignments were merely intended to mask discrimination.  Although the matter is close,

B.  Discriminatory and Retaliatory Discharge Claims

Plaintiff alleges she was terminated for filing a charge of discrimination with the PHRC, for complaining of gender discrimination, and for her gender.  (Complaint, Counts II, IV, VI & VIII.)  Under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), and under the PHRA, an employer is prohibited from discriminating against any of its employees because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[10]  Where there is no direct evidence of a discriminatory or retaliatory motive, retaliation claims are analyzed under the previously mentioned burden shifting framework articulated in McDonnell Douglas.

To set forth a prima facie case of retaliation, a plaintiff is required to show the following:

(1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse"; and (4) there was a causal connection between her participation in the protected activity and the adverse

---

Plaintiff has presented sufficient evidence to defeat the summary judgment motion on the genuineness of the reasons given by LCCC.  Stated otherwise, a jury could find that there was a disinclination on the part of Dr. Donohue to work with women administrators, especially given the circumstances under which the other women vice president left LCCC and the fact that males replaced both female vice presidents.

[10] 42 U.S.C. § 2000e-3(a) seeks to prevent harm to individuals based on what they do, i.e, their conduct, whereas 42 U.S.C. § 2000e-2(a) seeks to prevent injury to individuals based on who they are, i.e., their status.  Burlington, 548 U.S. at 63.

employment action.

Hare v. Potter,  220 F. App'x 120, 127 (3d Cir. 2007) (quoting Moore v. City of Philadelphia,

461 F.3d 331, 341-342 (3d Cir. 2006)).

To satisfy the second element, "a plaintiff must show that a reasonable employee would

have found the challenged action materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Burlington, 548 U.S. at 68 (internal quotation marks omitted).  As noted above, employment

decisions such as transfers and demotions may suffice to establish adverse employment

action, and must be considered on a case-by-case basis.  Jones, 198 F.3d at 411-412.  For the

reasons discussed with regard to Dr. Santo's core anti-discrimination claim, there is a genuine

issue of material fact whether Dr. Santo's reassignment of responsibility, as well as her

exclusion from the plan design committee and finance meetings, was materially adverse.[11]

In considering the causal link between the protected conduct and alleged adverse

action, the fourth element, "a plaintiff may rely on a 'broad array of evidence' to demonstrate a

causal link between his protected activity and the adverse action taken against him."  Marra v.

Phila Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007) (citing Farrell, 206 F.3d at 284).  The

---

[11]During the time in which Dr. Santo allegedly complained of gender discrimination, she
testified that Dr. Donohue cancelled personal meetings and excluded her from financial
committee meetings.  Accordingly, she has satisfied the second element of her prima facie
case – after or contemporaneous with engaging in protected conduct, the employer took an
adverse action against the employee.

temporal proximity between the plaintiff's protected activity and the alleged retaliatory conduct, and the existence of a pattern of antagonism in the intervening period should be assessed. (Id.)  "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."  Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997).  Thus, "each case must be considered with a careful eye to the specific facts and circumstances encountered."  Farrell, 206 F.3d at 279 n.5.; see Hare v. Potter,  220 F. App'x at 128.  The question is whether Dr. Santo has placed enough evidence in the record to create a genuine issue of material fact as to whether there was a causal link between her complaints and her termination.

It is unclear when exactly Dr. Santo first complained of gender discrimination.  Dr. Santo stated in her affidavit that: "prior to my June 2004 performance evaluation by Dr. Donohue, I complained to Dr. Donohue that I was being discriminated against on account of sex and I told members of the finance committee that I was being compensated lower than other vice-presidents, who were males, and Mr. Moses and Mr. Amico, based on their raises." (Santo Aff., at ¶ 82.)  Dr. Santo also insisted that she asked Mr. Amico "many times in his capacity as the College's Discrimination Chair to help" her with Mr. Moses' alleged abusive conduct.[12] (Id. at ¶ 63.)

---

[12]From this statement, it is unclear whether Dr. Santo was complaining of gender discrimination or simply her strained relationship with Dr. Moses, or whether she complained before or after her filing of the PHRA complaint.

By way of contrast, when asked about the substance of Dr. Santo's complaint and when it occurred, Dr. Donohue testified that Dr. Santo complained of her lower salary, but not gender discrimination. (Donohue Dep., at 114.)  Mr. Amico testified that he heard Dr. Santo only complain that Mr. Leary was receiving more money.  (Amico Dep., at 66.)  Mr. Moses testified that Dr. Santo never spoke about how she was paid compared to males at the college, just that she deserved additional compensation.  If Dr. Santo's version is credited, which it must be on the summary judgment record, then a fact-finder could infer that Dr. Santo complained of gender discrimination, and not simply strained office relationships, before her evaluation of July 2004.

Dr. Santo's discharge occurred a little more than seven months after she filed her PHRC complaint, and even more time passed before Dr. Santo allegedly complained of gender discrimination.  Although there is no set parameter of time to allow an inference of causation, a seven month gap or more under these facts is not so unusually suggestive as to support an inference of retaliation, especially considering the fact that Dr. Santo had an evaluation, an update evaluation, a suspension with pay, and a hearing before her termination.

When there is a lack of temporal proximity, as there is in this case, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference.  Kachmar, 109 F.3d at 177.  If Dr. Santo complained of gender discrimination before her June 2004 evaluation, then her June 2004 evaluation, which found her performance

deficient, coupled with her November 2004 update evaluation, also finding her deficient, could create an inference of a "pattern of antagonism."  Dr. Santo's  allegations that Dr. Donohue cancelled meetings and that Mr. Moses verbally abused her could also be inferred to be part of the pattern.  Therefore, Dr. Santo has proffered sufficient, although not compelling, evidence to support a conclusion that LCCC has demonstrated a "pattern of antagonism" that connects her complaints of gender discrimination to her termination.

Defendant asserts that Dr. Santo poorly performed her duties as vice president as its legitimate, non-discriminatory reason for terminating her.  (Def.'s Br. Supp. Mot. Summ J., at 9.) There is a plethora of evidence to sustain LCCC's proffered reasons for her termination. Beginning with the first evaluation in fall of 2003, Dr. Donohue noted concerns with respect to issues in Dr. Santo's relationships with others.  She again made these observations in the evaluation of July 2004 and the update in November 2004, and found that Dr. Santo failed to correct them.  Both Messrs. Amico and Moses testified of abusive behavior by Dr. Santo, such as kicking chairs and yelling at employees.  Dr. Donohue also mentioned a string of other problems in her deposition and evaluations, such as failing to adequately perform assignments, submitting incomplete budget requests, which put the college at a disadvantage, and circulating a financial report to the board of directors which contained significant errors.  Thus, LCCC has satisfied its burden.

Because LCCC has satisfied its relatively light burden, the burden shifts to Dr. Santo,

who now must present evidence sufficient to support an inference that LCCC's articulated

rationale is a pretext for gender discrimination.  Showalter v. Univ. of Pittsburgh Med. Ctr., 190

F.3d 231, 235 (3d Cir.1999); Fuentes, 32 F.3d at 759; Martinelli v. Penn Millers Ins. Co., No.

3:CV-02-2292, 2005 WL 2100695, at *6 (M.D. Pa. Aug. 29, 2005).  Our Court of Appeals has

recognized two ways in which a plaintiff can prove pretext.  First, the plaintiff can present

evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the

defendant so that a factfinder could reasonably conclude that each reason was a fabrication."

Fuentes, 32 F.3d at 762. Second, and alternatively, the plaintiff can provide evidence that

"allows the factfinder to infer that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action."  Id.  The court further explained:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show
> that the employer's decision was wrong or mistaken, since the factual dispute at
> issue is whether discriminatory animus motivated the employer, not whether the
> employer is wise, shrewd, prudent, or competent.  Rather, the nonmoving plaintiff
> must demonstrate such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered legitimate reasons for
> its actions that a reasonable factfinder could rationally find them unworthy of
> credence.

Fuentes, 32 F.3d at 765; Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d

Cir.1997) (citation omitted); see Atkinson v. Lafayette College, 460 F.3d 447, 454 (3d Cir.

2006).  The plaintiff need not come forward with additional evidence above that of the prima

facie case, but "point[] to evidence sufficiently to discredit the defendant's proffered reasons."

Fuentes, 32 F.3d at 764.  "[T]he plaintiff's evidence rebutting the employer's proffered

legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a <u>post</u> <u>hoc</u> fabrication or otherwise did not actually motivate the employment action." <u>Id.</u> (internal citations omitted).

Dr. Santo has sustained her burden by presenting evidence that calls into question the reasons articulated by the defense.  First, she points to the precipitous reduction in her performance rating after she complained of discrimination.  Moreover, she has disputed Defendants' characterization of her performance.  She testified that she properly and fully performed her assignments and duties as vice president.  Crediting her testimony, a jury could reasonably infer that the evaluations were not bona fide and that poor performance and insubordination were not the reason for her firing.  LCCC's alleged adverse actions toward Dr. Santo – her reassignment of duties, her exclusion from the strategic plan design team and finance committee meetings, and Dr. Donohue's cancelling of meetings – could also demonstrate retaliatory or discriminatory animus on its behalf.  Thus, Dr. Santo has set forth sufficient evidence that LCCC's proffered non-discriminatory reason for her discharge is not credible.[13]  Accordingly, summary judgment on the termination claim will be denied.

---

[13] Whether considered from the perspective of a discrimination or retaliation claim, the analysis remains the same.  The crucial issue is whether there is evidence calling into doubt the reasons articulated by the defense for its action.  Once sufficient evidence has been tendered, a jury could, but need not, infer the wrongful motivation, whether it be discrimination or retaliation.  Thus, it is appropriate to conflate the discrimination and retaliation analyses in the context of the termination of Plaintiff's employment.

III.  <u>CONCLUSION</u>

      For the reasons stated in the foregoing memorandum, Defendant's Motion for Summary Judgment will be granted as to Dr. Santo's disparate treatment in pay claim and denied in all other respects.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

28

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


JUNE SANTO, Ed.D.,                      :
                        Plaintiff       :
                                        :
        v.                              :        3:CV-05-2463
                                        :        (JUDGE VANASKIE)
LUZERNE COUNTY COMMUNITY                :
COLLEGE,                                :
                        Defendant       :

ORDER

NOW, THIS 15th DAY OF SEPTEMBER, 2008, for the reasons set forth in foregoing

memorandum, IT IS HEREBY ORDERED THAT:

1.  Defendant's Motion for Summary Judgment (Dkt. Entry 27) is GRANTED as to Dr.

Santo's disparate treatment in pay claim, and DENIED in all other respects.

2.  A telephonic scheduling conference shall be held on October 6, 2008, at 3:00 p.m.

Counsel for Plaintiff is responsible placing the call to (570) 207-5720 and all parties should be

ready to proceed before the undersigned is contacted.

                                s/ Thomas I. Vanaskie
                                Thomas I. Vanaskie
                                United States District Judge